**Coy KINCHEN and Mabel Kinchen, d/b/a Coy-Mabel Kinchen Lumber Company et al., Appellants,**

v.

**LEXINGTON INSURANCE CO. et al., and Arkansas Oak Flooring Co., Intervenor, Appellees.**

**LEXINGTON INSURANCE COMPANY et al., Appellants,**

v.

**ARKANSAS OAK FLOORING CO., Intervenor, Appellee.**

**No. 18835.**

United States Court of Appeals Fifth Circuit.

July 20, 1961.

J. Elton Huckabay, Baton Rouge, La., for appellant, Kinchen.

Robert J. Vandaworker, and David W. Robinson, Baton Rouge, La., Watson, Blanche, Wilson, Posner & Thibaut, Taylor, Porter, Brooks, Fuller & Phillips,

582

Baton Rouge, La., of counsel, for appellant-appellee, Lexington.

Victor A. Sachse, Baton Rouge, La., Breazeale, Sachse & Wilson, Baton Rouge, La., of counsel, for Arkansas Oak Flooring Co.

Before TUTTLE, Chief Judge, RIVES, Circuit Judge, and DE VANE, Senior District Judge.

RIVES, Circuit Judge.

These actions were upon fire insurance policies, or rather a cover or master policy in the sum of $3,500 issued by Lexington Insurance Company, and three certificates in the total sum of $31,500 subscribed in various percentages by fourteen companies, members of Lloyds of London, and warranted to the same terms and conditions as the Lexington policy. The policies covered a sawmill building and two sawmills, machinery and equipment located in the town of Corbin, Livingston Parish, Louisiana. The Lexington policy contained a warranty upon which the insurance companies relied in defending the actions:

> "11. Watch Service Clause (This clause void as to windstorm insurance) — It is warranted by the insured that adequate watch service, with sufficient watch clock system, shall be maintained on the premises nights, Sundays and holidays and at such other times as the plant may not be in operation."

The policies were issued to the Kinchens, and contained a New York or standard mortgage clause in favor of Arkansas Oak Flooring Company as its interest might appear.

At the time these policies were issued there had been in effect for about a year other policies on the same property issued by six other insurance companies in the aggregate sum of $25,000. Those companies tendered into court the amount of their admitted liability which was ultimately accepted by the Kinchens and Arkansas Oak Flooring Company to be applied in part payment on the latter's mortgage debt. Those policies also had contained provisions requiring watch service, and the Kinchens had been employing two watchmen for the premises.

On January 4, 1957, the watchman service was discontinued. Eleven days later, shortly after midnight of January 15, 1957, the sawmills, building, and certain equipment were totally destroyed by fire.

■ The case was tried to the court without a jury. The district court found against the Kinchens because they had breached their duty under the policies by discontinuing the watch service. From the judgment entered against them, the Kinchens appeal. The district court entered judgment in favor of the mortgagee, Arkansas Oak Flooring Company, upon a finding that it had no knowledge of the discontinuance of the watchman service prior to the fire. From that judgment Lexington and its associated insurance companies appeal.

The Kinchens' Appeal.

The Kinchens claim that the broker through whom they procured the Lexington policies represented to them that watch service would not be required, and that the master policy was delivered to them so shortly prior to the fire that they had not had an opportunity to read it. The broker, deceased at the time of the trial, had testified by deposition that he had made no such representation to the Kinchens. Some corroboration to his testimony was supplied by a rough plat of the properties which he had furnished the insurance companies when procuring the policies, and upon which he had written "Watchman Service." Mrs. Kinchen testified that the broker first delivered to her the certificates without the master policy, and that the master policy was received through the mails very shortly before the fire and she "didn't even look at it." She distinctly remembered that the master policy was delivered on a Saturday. The last Saturday preceding January 15, 1957, the night of the fire, was on January 12. The broker was not certain, but thought that he had carried both the master policy and the certifi-

cates to Mrs. Kinchen. He testified that it would have been most unusual for the Lexington policy to have been mailed directly to the Kinchens. Mrs. Kinchen had instructed the broker to carry such papers as he did bring to her attorney for examination, and the attorney had in turn sent them back to Mrs. Kinchen by the broker with a note dated January 7, which reads as follows:

"'Dear Mabel, I think it is all right for the original policy to be sent to Arkansas Oak Flooring Company. Mr. Eicher says he will deliver a copy to you, and I note that the policy includes a mortgage clause in favor of Arkansas Oak, (and signed) Ben N. Tucker.'"

After receiving the note from her attorney, Mrs. Kinchen gave the broker a check for $502.50 in part payment of the premiums and signed an agreement to pay the balance in installments. The district court found against the Kinchens on the factual issues, and we cannot set its findings aside as clearly erroneous, Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

■ In the alternative, the Kinchens insist that, if the court accepts the Lexington policy as written, they are nevertheless entitled to recover by virtue of a Louisiana statute [1] providing in part that a breach of warranty shall not avail the insurer to avoid liability unless it be "such a breach as would increase either the moral or physical hazard under the policy." The Kinchens rely upon the testimony of an employee of the State Fire Marshal that his investigation led him to the conclusion that the fire was of electrical origin, "and my opinion is that the night watchman could have been standing and looking at it and there wouldn't have been a thing in the world he could have done about it if the condition existed as Mr. Jackson described it to me. I don't think I could have done anything about it." The district court nonetheless concluded:

"The breach of the warranty materially increased the physical hazard assumed under the insurance policies, so as to render such coverage null and void as to the plaintiffs. Terwilliger v. Union Fire, Accident & [General] Insurance Co. [La. App.], 185 So. 43; Norwich Union Indemnity Co. v. H. Kobacher (sic) & Sons Co., CCA 6, 31 F.2d 411 [87 A.L.R. 1069], Cert. Den., 50 S.Ct. 17, 280 U S 558 [74 L.Ed. 613]; Atlas Assurance Co. v. Standard Brick & Tile Corp., CCA 7, 264 F.2d 440."

We agree with the district court, and especially so in view of the testimony of expert witnesses introduced by the insurers to establish that the termination of watchman service definitely increases the physical hazard under the policies. It results that the Kinchens cannot prevail upon their appeal.

### The Appeal of Lexington and Its Associated Insurance Companies.

■ The insurance companies do not dispute the conclusion of law upon which the district court relied in entering judgment for the mortgagee, Arkansas Oak Flooring Company:

"* * * The mortgage clause is a separate contract of insurance with the mortgagee, though attached to the policy of the owner and depending on it for some of its provisions. (Commercial Securities Co., Inc. v. Central Securities (sic) & Insurance Corp. [La.App.], 29 So.2d 712; Motors Securities Co. v. Aetna Ins. Co. of Hartford, Conn. [La. App.], 17 So.2d 316; Home Insurance Company v. Currie [5 Cir.], 54 F.2d 203. The breach of the warranty by the plaintiffs in failing to maintain a night watchman does not constitute a defense as against the Intervenor, under the terms of the mortgage clause in the policies. Home Insurance Co. v. Currie [5 Cir.], 54 F.2d 203, 206."

1. LSA–R.S. 22:692.

There are, however, certain obligations imposed directly on the mortgagee itself, as thus expressed in the mortgage clause:

"Provided, also that the mortgagee (or trustee) shall notify this Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee), and, unless permitted by this Policy, it shall be noted thereon and the mortgagee (or trustee) shall on demand pay the premium for such increased hazard for the term of the use thereof; otherwise this Policy shall be null and void."

Impliedly recognizing the direct obligation on the part of the mortgagee, the district court found as a fact that Arkansas Oak Flooring Company had no knowledge of the discontinuance of the watchman service prior to the fire. That finding is attacked by the insurance companies as clearly erroneous.

Arkansas Oak Flooring Company relies on the testimony of its President, J. G. Smith, that the Lexington policy and the certificates were received by that Company on Saturday, January 12. He testified that on that date the policy and certificates were delivered to Mr. C. S. McNew, Jr., the director of the Arkansas Company in charge of its insurance problems. At the time of the fire, Mr. Smith had not received a report from Mr. McNew and Smith did not know whether there was any requirement in the policy about watchman service, nor did he then know that the watchman service had been discontinued. The insurance companies do not dispute the truthfulness of Mr. Smith's testimony. They point, however, to other evidence which is itself without dispute.

Arkansas Oak Flooring Company had a lumber yard adjacent to the Kinchens' sawmill in Corbin. Its employee L. B. Baird was in charge of that yard. The Kinchen watchmen punched the clock near the office of the Arkansas Company. Baird had kept a reasonably close check on the watch service. Mrs. Kinchen testified that on January 5 or 6th, the first or second night after the watch service had been discontinued:

"A. He [Mr. Baird] called on me to tell me — to ask me if I knew that — that the clocks hadn't been — I presume — I don't know if he asked me if mine had been punched or just asked me if I knew that — if their's had been punched. I wouldn't know just how he asked but that was his —

"Q. What did you tell him? A. I told him that they wasn't (sic) supposed to be; there wasn't any more night watchman.

"Q. What else did you tell him? A. That we was (sic) out with a company that did not require night watchmen.

"'Q. You told him you had taken out insurance with a company that didn't require night watchmen? A. Yes, if I recall right now. If I recall I said that so much and talked with so many — I'm most positive that I mentioned that to him too."

On that testimony Mrs. Kinchen was cross-examined very briefly by Arkansas' counsel:

"Q. It is true you told Mr. Baird that you had insurance that did not require a night watchman, is that correct? A. Yes. I'm satisfied that that's right."

At the conclusion of the testimony of Arkansas' President Smith, the following colloquy and stipulation ensued:

"Mr. Sachse [Counsel for Arkansas]: I'd like to state to the court that we have present and available Mr. Lee * * * [and] Mr. Baird in case he should be needed but Mrs. Kinchen has testified that she told him in answer to his inquiry about the watchmen that none was required and so I feel no need to call him but they are available if counsel for the defense or the plaintiffs would like to have them examined.

"Mr. Vandaworker [Counsel for Lexington]: Do I understand, Mr. Sachse, that you all concede that

Mrs. Kinchen did tell Mr. Baird before the fire that there were no watchmen at the Kinchen Lumber Company? Do you all concede that?

"Mr. Sachse: She said she told that to Mr. Baird. We don't challenge it.

"The Court: And that they were not needed.

"Mr. Sachse: And she said they were not needed, that's right.

"Mr. Vandaworker: Well, I'm not asking what Mrs. Kinchen said. I know what she said. I'm just trying to find out if the intervenor concedes they were notified there were no watchmen.

"Mr. Sachse: I read what Mrs. Kinchen said October 22nd, 1957, as what she had said to Mr. Baird. We agree that she did state to Mr. Baird what she then declared that she did.

"The Court: And what was that?

"Mr. Sachse: That she — Mr. Baird had asked her about watchmen and she said that she had none because none were required by her insurance.

"Mr. Vandaworker: Thank you."

It thus appears without dispute that some nine or ten days prior to the fire Arkansas was informed through its employee Baird of the discontinuance of the watchman service. There is no contention that Baird was not acting within the scope of his authority in checking with Mrs. Kinchen on the performance of the watch service. Whether or not Baird, on learning that the watch service had been discontinued, passed that information on to Smith, the president, or to any of the other officials, Baird's knowledge must be imputed to the Company.

It was not unnatural for Baird to rely upon Mrs. Kinchen's assurance that the changed insurance did not require watch service. That assurance was not, however, binding on the insurance companies, and especially so in view of the crediting by the district court of the insurance broker's testimony that he had not so informed Mrs. Kinchen. However, in the absence of knowledge or notice of any requirement of watch service in the new policies, it may be that the Arkansas Company owed no duty to the insurance companies either to cause the consequent increase of hazard to be corrected or to notify the companies; and it may be also that when the policies were delivered to the Arkansas Company some three or four days before the fire, it could then have refused to accept them as contracts binding on it as mortgagee, thereby reducing pro rata the coverage of its pre-existing policies.[2] When, however, after being fully informed, the Arkansas Company elected to accept the benefits of the new policies (and thereafter sued to collect the insurance), we know of no principle by which that Company can be relieved of the obligations of those policies. No later than the time of such informed acceptance, the insurance policies must be considered as binding contracts both as to the furnishing of insurance and as to the conditions and provisions upon which the insurance was furnished.

Moreover, Mr. McNew, the Arkansas director in charge of its insurance problems to whom the policies were delivered three of four days before the fire, was not called as a witness. Mr. Smith, Arkansas' President, testified that McNew had a telephone conversation with Eicher, the insurance broker, before the policies were received. McNew had ample opportunity to become familiar with the requirements of the policies as to watch service, and his knowledge of such requirement must be presumed. McNew's knowledge is, of course, imputed to his Company. After the policies were delivered to Arkansas, there was time to

---

2. Though it may be remarked that watch service was also required by those policies. And it is not material to the defense of the Lexington insurers that those other insurers either were not fully informed as to their apparent defense against the mortgagee, or elected to waive that defense and admit liability.

pursue one of several courses to protect the Arkansas Company; for example: (1) to cause the watch service to be resumed, (2) to notify the insurance companies, or (3) to reject outright the new policies. It would be manifestly unjust to permit the Arkansas Company to accept the new policies as providing it with additional insurance, and at the same time to disavow the obligations imposed upon it by those policies.

The judgment against the Kinchens and in favor of the defendants is affirmed. The judgment in favor of the Arkansas Oak Flooring Company is reversed and the cause remanded with directions to enter judgment for the defendants.

In part affirmed and in part reversed with directions.